JUDGE DANIELS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

13 CIV 8673

ANNETTE BROCK and PRISCILLA DUTTON,
on Behalf of and as Parent and Grandparent
of S.B., a student with a disability,

                            Plaintiffs,

        - against -

NEW YORK CITY DEPARTMENT
OF EDUCATION,

                     Defendant.

-------------------------------------------------------------------x

**COMPLAINT**

Civil Action No.

ECF Case

RECEIVED
DEC 06 2013
U.S.D.C. S.D. N.Y.
CASHIERS

CITY OF N.Y. LAW DEPT.
OFFICE OF CORP. COUNSEL
2013 DEC -6

**PRELIMINARY STATEMENT**

1. This action is authorized by the Individuals with Disabilities Education Improvement Act of 2004 (IDEA), 20 U.S.C. § 1415(i)(2)(A), to review a final administrative decision of the New York State Review Officer (SRO) regarding the provision of a free appropriate public education (FAPE) to S.B., a minor student with a disability.

2. Plaintiffs Annette Brock and Priscilla Dutton seek reversal of the SRO's August 9, 2013 decision denying them tuition funding for S.B.'s placement at the Cooke Center for Learning and Development (Cooke), a private, not-for-profit school for students with disabilities, for the 2011–2012 school year.

3. This action is timely commenced within four months after the date of the SRO decision pursuant to 20 U.S.C. § 1415(i)(2)(B) and New York Education Law § 4404(3)(a).

**JURISDICTION AND VENUE**

4. The Court has subject matter jurisdiction over this action under the IDEA, 20 U.S.C. § 1415(i)(2)(A), and 28 U.S.C. §§ 1331 and 1343.

5. The Court has supplemental jurisdiction to adjudicate state claims arising out of the same facts as the asserted federal claims. 28 U.S.C. § 1367.

6. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) as the judicial district in which defendant New York City Department of Education (DOE) has its principal offices.

## PARTIES

7. Plaintiff Annette Brock is the mother of S.B., who was a minor during the 2011-2012 school year. Plaintiff Priscilla Dutton is the grandmother of S.B.

8. S.B. was born in 1994 and is currently 18 years old.

9. S.B. is identified by her initials in the caption of this action and throughout the Complaint consistent with Federal Rule of Civil Procedure 5.2(a).[1]

10. Ms. Brock, Ms. Dutton, and S.B. reside together in the Bronx, New York.

11. Defendant DOE is a municipal corporation whose principal offices are located at 52 Chambers Street, New York, New York 10007.

12. The DOE is responsible under the IDEA and the New York State Education Law for providing a FAPE to New York City residents between the ages of three and 21 who have been classified as students with disabilities in need of special education services and who have not yet received a high school diploma.

## LEGAL FRAMEWORK

13. In enacting the IDEA, Congress created a comprehensive statutory framework for

---

[1] While S.B. is no longer a minor, this Complaint refers to her by her initials because the administrative litigation in this matter commenced when she was age 16. *See P.M. v. Evans–Brant Cent. Sch. Dist.*, No. 08–CV–168A, 2008 WL 4379490, at *3 (W.D.N.Y. Sept. 22, 2008) ("[I]n an action commenced by a parent or guardian on behalf of a minor child pursuant to the IDEA, the plaintiffs should be permitted to proceed, as a matter of course, using initials in place of full names in public filings with the Court"); *see J.M. and N.M. ex rel. L.M. v. New York City Dep't of Educ.*, No. 12-CV-8504(KPF), 2013 WL 5951436, at fn.1 (S.D.N.Y. Nov. 7, 2013).

"ensur[ing] that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A).

14. States receiving federal financial assistance under the IDEA must adhere to the Act's procedural and substantive requirements and must ensure that all children with disabilities are afforded a FAPE. 20 U.S.C. § 1412(a).

15. In order to satisfy the requirements of the IDEA, a school district must provide each disabled child with "special education and related services," 20 U.S.C. § 1401(9), that are "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982).

16. School districts must have an Individualized Education Program (IEP) in place for each student with a disability at the beginning of each school year and must review that IEP not less than annually. 20 U.S.C. §§ 1414(d)(2)(A), (d)(4)(A)(i).

17. The IDEA further mandates that school districts reevaluate each student with a disability at least once every three years, unless the parent and the school district agree otherwise. 20 U.S.C. § 1414(a)(2)(B)(ii); *see also* 8 N.Y.C.R.R. § 200.4(b)(4) ("A committee on special education shall arrange for an appropriate reevaluation ... at least once every three years, except where the school district and the parent agree in writing that such reevaluation is unnecessary.")

18. Evaluations must be "sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified." 34 C.F.R. § 300.304(c)(6). School districts must assess students "in all areas related to the suspected disability, including, if appropriate, health, vision,

hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities." 34 C.F.R. § 300.304(c)(4).

19. In addition, school districts are required by the IDEA and New York State law to conduct age-appropriate assessments to support students in preparing to transition from school to post-school activities. 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa) (requiring that "beginning not later than the first IEP to be in effect when the child is 16, and updated annually thereafter," an IEP must include "appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills"); 8 N.Y.C.R.R. § 200.4(b)(6)(viii) (requiring school districts to ensure that students who have reached age 12 "receive an assessment that includes a review of school records and teacher assessments, and parent and student interviews to determine vocational skills, aptitudes and interests.")

20. A school district is required to seek input from a student's parents in determining whether additional data is needed as part of a reevaluation. 20 U.S.C. § 1414(a)(2)(B)(ii). If the school district determines that additional data are not needed, the district must notify the parents of that determination, including "the reasons for the determination" and "[t]he right of the parents to request an assessment to determine whether the child continues to be a child with a disability, and to determine the child's educational needs." 34 C.F.R. §§ 300.305(d)(i)-(ii).

**Due Process Procedures**

21. The IDEA provides "procedural safeguards that enable parents and students to challenge the local educational agency's decisions," *Murphy v. Arlington Cent. Sch. Dist.*, 297 F.3d 195, 197 (2d Cir. 2002) (citing 20 U.S.C. § 1415), including the right to file a due process complaint "with respect to any matter relating to the identification, evaluation, or educational placement of

the child, or the provision of a free appropriate public education to such child," 20 U.S.C. § 1415(b)(6)(A).

22. In New York, IDEA due process complaints must be initially litigated in a hearing conducted at the school district level before an impartial hearing officer (IHO). N.Y. Educ. L. § 4404(1); 8 N.Y.C.R.R. § 200.5(i)–(j).

23. New York State law places the burden of proof in impartial hearings on school districts, "including the burden of persuasion and burden of production," "except that a parent or person in parental relation seeking tuition reimbursement for a unilateral parental placement shall have the burden of persuasion and burden of production on the appropriateness of such placement." N.Y. Educ. L. § 4404(1)(c).

24. "In matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies -- (I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii)(I-III). Subject to this provision, the decision of an IHO "shall be made on substantive grounds based on a determination of whether the child received a free appropriate public education." 20 U.S.C. § 1415(f)(3)(E)(i).

25. The decisions reached in impartial hearings are subject to administrative appeals to the SRO. 34 C.F.R. § 300.514(b); N.Y. Educ. L. § 4404(2); 8 N.Y.C.R.R. § 200.5(k).

26. Those portions of an IHO's decision not appealed by either party are final and binding, and may not be reviewed by the SRO. *See* 34 C.F.R. § 300.514(a); 8 N.Y.C.R.R. § 200.5(j)(5)(v).

27. Once administrative remedies have been exhausted, either party may seek independent judicial review of the SRO's decision in the state or federal courts. 20 U.S.C. § 1415(i)(2)(A).

28. In an appeal to the federal district court under 20 U.S.C. § 1415(i)(2)(A), the court receives the record of the administrative proceedings and may accept additional evidence at the request of either party. 20 U.S.C. § 1415(i)(2)(C).

29. The district court "must engage in an independent review of the administrative record and make a determination based on a 'preponderance of the evidence.'" *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007) (quoting *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1120 (2d Cir.1997)).

30. The court gives "due weight" to administrative rulings based on educational policy. *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998).

31. The court does not accord "due weight" when there are no administrative findings on an issue. *Jennifer D. ex rel. Travis D. v. New York City Dep't of Educ.*, 550 F. Supp. 2d 420, 432 (S.D.N.Y. 2008). Nor does a court accord "due weight" to administrative proceedings when determining questions of law. *Lillbask ex rel. Mauclaire v. Connecticut Dep't of Educ.*, 397 F.3d 77, 82 (2d Cir. 2005).

32. Generally, a reviewing court's "analysis will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example, whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 244 (2d Cir. 2012). "Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not." *Id.* Additionally, where the administrative findings of the IHO and the SRO disagree and "where the

SRO rejects a more thorough and carefully considered decision of an IHO, it is entirely appropriate for the court … to consider the IHO's analysis, which is also informed by greater educational expertise than that of judges, rather than to rely exclusively on its own less informed educational judgment." *Id.* at 246.

### Tuition Payment Remedy

33. The IDEA grants courts broad discretion to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii).

34. In *Burlington v. Department of Education*, 471 U.S. 359 (1985), the Supreme Court interpreted this statutory provision to "confer[] broad discretion on the court" to grant relief that is "'appropriate' in light of the purpose of the Act," *id.* at 369, including an award of tuition reimbursement to parents where (1) the services offered by the school district are inadequate or inappropriate; (2) the private school selected by the parents is an appropriate placement for the student; and (3) equitable considerations support the parent's claim (the three "*Burlington* prongs"), *id.* at 369–70, 374; *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 12, 16 (1993).

35. The 1997 and 2004 reauthorizations of the IDEA include a tuition reimbursement provision stating: "If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment." 20 U.S.C. § 1412(a)(10)(C)(ii); IDEA Amendments of 1997, Pub. L. No. 105-17, 111 Stat. 37, 63 (1997).

### Direct Tuition Payment

36. The Supreme Court has held that 20 U.S.C. § 1412(a)(10)(C)(ii) is "best read as elucidative rather than exhaustive" with respect to the tuition remedies available under the IDEA, *Forest Grove Sch. Dist. v. T.A.*, 129 S. Ct. 2484, 2493 (2009), and that the equitable power of courts under § 1415(i)(2)(C)(iii) is independent of, and broader than, the specific tuition reimbursement provision in the Act. *Id.* at 2494–95.

37. Relying upon this analysis, this Court has held that the IDEA authorizes an award of retroactive tuition payment directly to a private school where the three *Burlington* prongs are satisfied, the "parents lack the financial resources to 'front' the costs of private school tuition, and . . . a private school is willing to enroll the student and take the risk that the parents will not be able to pay tuition costs." *Mr. and Mrs. A. ex rel. D.A. v. New York City Dep't of Educ.*, 769 F. Supp. 2d 403, 428 (S.D.N.Y. 2011); *see also A.R. ex rel F.P. v. New York City Dep't of Educ.*, No. 12-CV-4493(PAC), 2013 WL 5312537 at *7, (S.D.N.Y. Sept. 23, 2013) ("[I]t would be grave error to conclude from the fact that Plaintiff did not have the means to pay for a private placement that her daughter is precluded from receiving the *free* appropriate public education that the IDEA is intended to guarantee") (emphasis in original).

## FACTS

### S.B.'s Disability

38. S.B. was 16 years old at the start of the 2011-2012 school year and turned 17 during the course of the year.

39. S.B. was classified by the DOE as a student with "Learning Disability."

40. S.B. has been diagnosed with Mild Intellectual Disability and Attention Deficit Hyperactivity Disorder.

**S.B.'s Educational History**

41. S.B. has been classified as a student with a disability by the DOE's Committee on Special Education (CSE) since she was in kindergarten.

42. S.B. attended DOE public schools from kindergarten through the 2005-2006 school year, when she was 11 years old and in sixth grade.

43. While attending public schools, S.B. was placed in self-contained special education classes with 12 students.

44. In the spring of 2006, S.B.'s academic functioning was below first-grade level and she was unable to read.

45. In September 2006, S.B. began attending Cooke.

46. The DOE agreed to pay for the cost of S.B.'s attendance at Cooke for grades seven through 11, the 2006–2007 through 2010-2011 school years.

47. At Cooke, S.B.'s academic skills, as well as her behavioral and attentional issues improved, and within two years she had progressed from being a non-reader to reading at a fourth-grade level.

**The 2011–2012 School Year IEP Review -- The Absence of a Triennial Evaluation**

48. A CSE meeting was held on June 3, 2011 to create an IEP for S.B. for the 2011-2012 school year.

49. The IDEA required the DOE to reevaluate S.B. "at least once every 3 years," unless it came to an agreement with Ms. Brock and Ms. Dutton "that reevaluation [was] unnecessary." 20 U.S.C. § 1414(a)(2)(B)(ii).

50. Prior to the June 3, 2011 CSE meeting, the DOE had last evaluated S.B. in the spring of 2005.

51. There was no agreement – written or unwritten – between the DOE and Ms. Brock and Ms. Dutton that a reevaluation was unnecessary.

52. The DOE failed to involve Ms. Brock and Ms. Dutton in any of the three determinative steps the IDEA requires with respect to reevaluations.

53. First, there was no agreement that a reevaluation was unnecessary per 20 U.S.C. § 1414(a)(2)(B)(ii). There was no written agreement between the DOE and Ms. Brock and Ms. Dutton that a reevaluation was unnecessary as required under 8 N.Y.C.R.R. § 200.4(b)(4).

54. Second, the DOE did not contact Ms. Brock and Ms. Dutton, as required under 20 U.S.C. § 1414(c)(1)(B), in order seek their input in determining whether additional data was needed as part of the reevaluation process.

55. Third, the DOE did not notify Ms. Brock and Ms. Dutton of any determination that no additional data was needed and the reasons for the determination; and the DOE did not notify Ms. Brock and Ms. Dutton of their right to request an assessment to determine S.B.'s educational needs, as required under 20 U.S.C. § 1414(c)(4)(A) and 34 C.F.R. § 300.305(d).

56. Additionally, despite the fact that S.B was age 16, no vocational assessment or any other assessments designed to identify S.B.'s needs with respect to transition from school to post-school activities was conducted prior the June 2011 CSE meeting as required under 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa), and 8 N.Y.C.R.R. § 200.4(b)(6)(viii).

**The June 3, 2011 IEP**

57. The individuals present at the June 3, 2011 CSE meeting were: Ms. Brock; Ms. Dutton; Jacqueline Giurato, the special education teacher assigned to CSE Region 9; a parent member; a sign language interpreter to translate for Ms. Brock, who is deaf; as well as two

educators from Cooke, Sally Ord, who worked in student support services, and English
Language Arts teacher Jamal Bermudez.

58. The IEP recommended that S.B. be placed in a 12:1:1 program in a specialized, "District
75" public school for the 12-month school year.

59. The IEP reported that S.B. was performing math on a mid-second to mid-third-grade
level; that she was reading at a fifth-grade instructional level and a third-grade level
independently; and that she could become frustrated with her classmates if they were not
working at her pace.

60. The IEP listed S.B.'s academic management needs as: small group instruction; directions
read, reread, and rephrased as needed; graphic organizers/charts/graphs/checklists;
manipulative/graph paper; tasks broken down into small sequential steps; visual and auditory
cues; reminders to work slowly and carefully; and direct teacher modeling.

61. The IEP contained no information concerning S.B.'s specific cognitive functioning and it
contained no information on S.B's specific impairments and deficits. *See* 8 N.Y.C.R.R. §
200.1(ww)(3)(i)(a) (a student's IEP shall include "*academic achievement, functional
performance and learning characteristics* which shall mean the levels of knowledge and
development in subject and skill areas, including activities of daily living, level of intellectual
functioning, adaptive behavior, expected rate of progress in acquiring skills and information, and
learning style") (emphasis in original).

62. At the CSE meeting, Ms. Ord objected to the IEP's 12:1:1 program recommendation,
indicating that it would not provide S.B. with as small and supportive a learning environment as
she required. Ms. Ord also objected that the program could not meet S.B.'s specific management
needs.

63. With respect to S.B.'s social-emotional functioning, the IEP recommended that S.B. receive related services of individual counseling once a week for 45 minutes, group counseling once a week for 45 minutes, and group speech therapy in two 45 minute sessions per week.

64. Socially and emotionally, the IEP indicated that S.B. was more verbal in class, asked for clarification, had better participation, was more engaged, and might work fast and become frustrated with peers who do not work at the same pace.

65. The IEP's long term goals for S.B. were to further integrate into the community with support; participate in vocational or job training; live independently with support; and find employment in an area of interest with support of local agencies and community organizations.

66. The IEP contained no specific information on S.B.'s independent living skills or information on the skills she needed to develop to transition from an educational setting to employment. *See* 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa) (requiring an IEP include "appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills"); 8 N.Y.C.R.R. § 200.4(b)(6)(viii) (requiring that students "receive an assessment that includes a review of school records and teacher assessments, and parent and student interviews to determine vocational skills, aptitudes and interests.")

67. On June 9, 2011, counsel for Ms. Brock and Ms. Dutton wrote to the DOE on their behalf objecting to the IEP's 12:1:1 program recommendation as educationally inappropriate because S.B. required a smaller, more supportive program in order to make academic progress.

**The DOE's Recommended Placement**

68. On June 14, 2011, the DOE issued a Final Notice of Recommendation designating

S.B.'s placement for the 2011-2012 school year as P721X at the Stephen D. McSweeney School (McSweeney).

69. McSweeney was the same placement that the DOE offered S.B. for the previous, 2010-2011 school year.

70. Ms. Brock and Ms. Dutton visited McSweeney in June 2010 in connection with the DOE's placement recommendation for the 2010-2011 school year. During their visit to McSweeney, Ms. Brock and Ms. Dutton learned that McSweeney's program was focused on students with lower academic functioning than S.B., and that the students received very limited academic instruction in basic literacy and math.

71. Ms. Brock and Ms. Dutton concluded that McSweeney's program was not appropriate for S.B. and would cause S.B. to regress academically during the 2010-2011 school year.

72. Ms. Brock and Ms. Dutton also learned that McSweeney would offer S.B. few opportunities to progress toward her long-term goals of living and working independently, as the school offered no individual internship program, limited opportunities for travel training, and little training in using academic skills in the context of the community.

73. Ms. Brock and Ms. Dutton visited McSweeney again on June 27, 2011, with Cooke educator Sally Ord. A McSweeney "parent coordinator" spoke with them, informing them that "nothing had changed" at the school in the intervening year.

74. On July 14, 2011, counsel for Ms. Brock and Ms. Dutton sent a letter to the DOE, documenting their objections to S.B.'s placement at McSweeney as the school's academic and transition programs were inappropriate for S.B.

75. The DOE never offered a placement other than McSweeney for S.B. for the 2011-2012 school year.

**S.B.'s Reenrollment in Cooke**

76. Ms. Brock and Ms. Dutton reenrolled S.B. in Cooke for the 12-month 2011-2012 school year, signing enrollment contracts with Cooke on March 24, 2011, for the academic year, and on July 5, 2011 for the summer term.

77. The enrollment contracts afforded Ms. Brock and Ms. Dutton the flexibility to continue working with the DOE to identify a public school placement for S.B., and to withdraw S.B. from Cooke without financial penalty if the DOE offered S.B. an appropriate placement by certain.

78. The enrollment contracts provided that S.B.'s tuition at Cooke was $7,275.00 for the summer term and $48,500.00 for the academic year.

79. Ms. Brock and Ms. Dutton, through counsel, repeatedly notified the DOE of their concerns regarding the IEP and the public school placement in letters dated, June 9, July 14, and August 9, 2011.

**S.B.'s Educational Program at Cooke**

80. Cooke's high school served approximately 108 students with disabilities during the 2011–2012 school year. The school was small enough so that all of Cooke's staff knew and were acquainted with all of the school's students.

81. Cooke's teachers regularly met with each other, as well as the school's counselors and therapists, to review students' cross-curricular goals and activities.

82. S.B.'s academic classes at Cooke during the 2011-2012 school year contained no more than ten students. S.B.'s math class contained six students and her reading "cohort" had only three students. There was a head teacher and an assistant teacher in all of her academic classes.

83. S.B.'s classes at Cooke contained students classified as either "Learning Disabled" or

"Speech and Language Impaired." Her classmates were functioning at similar academic and social levels to her.

84. Cooke provided S.B. with 90 minutes per week of speech-language therapy and 90 minutes per week of counseling services designed to address her individual needs.

85. As part of her program at Cooke, S.B. participated in activities aimed at developing independent living skills. S.B. interned at an animal shelter. Her math class applied learned skills in community settings. For example, students opened and operated a back account, budgeted, and shopped. Cooke provided travel training, assistance in working with government agencies, as well as classes to develop vocational skills and self-advocacy.

86. S.B. made meaningful progress at Cooke during the 2011–2012 school year. Her progress included improved academic performance in math, reading, and writing; as well as improved independence, independent decision-making, and self-advocacy.

**Dr. Lisa Shulman's Report**

87. A January 19, 2012 report and history from developmental pediatrician Lisa Shulman, M.D., indicates that she had treated S.B. since age one.

88. In her report, Dr. Shulman recounted a history of S.B.'s education, noting that through the spring of 2006 S.B. had attended public schools in 12-student classes. S.B. had not learned to read in that time, and her behavior was noted as aggressive and defiant; she was easily frustrated; and she exhibited significant attention issues.

89. Dr. Shulman stated that S.B. had progressed while attending Cooke due to the school's small group and one-on-one instruction, which she had not been provided in the 12-student public school classes. The doctor opined that S.B. needed to be in classes without emotionally disturbed children that could distract her, and she needed a school with a strong transitional

program to prepare her for post-school life. The doctor concluded that Cooke's program was appropriate for S.B., and would allow her to continue making academic, social, behavioral, and life skills progress.

### The Impartial Hearing

90. Ms. Brock and Ms. Dutton, through counsel, filed a due process complaint on October 4, 2011.

91. The due process complaint alleged that the DOE denied S.B. a FAPE for the 2011–2012 school year because the DOE failed to adequately evaluate S.B., failed to prepare an appropriate IEP, and failed to offer an appropriate school placement.

92. The due process complaint requested an order directing the DOE to issue direct payment for S.B.'s tuition at Cooke for the 12-month 2011–2012 school year, in the amount of $55,775.00, as Ms. Brock and Ms. Dutton lacked the financial means to pay the tuition in advance and seek reimbursement.

93. The case was assigned to IHO Martin J. Kehoe, III, who presided at an impartial hearing on January 26, February 1, and February 29, 2012.

94. Legal counsel represented the DOE, as well as Ms. Brock and Ms. Dutton.

95. The DOE bore the burden of proof, including the burden of production and the burden of persuasion, on the first *Burlington* prong – that it offered S.B. a FAPE for the 2011–2012 school year. N.Y. Educ. L. § 4404(1)(c).

96. The DOE presented the testimony of three witnesses: (1) Special Education Teacher Jacqueline Giurato, who was assigned to CSE Region 9; (2) McSweeney Assistant Principal Christopher Dugan; and (3) McSweeney Special Education Teacher Brian Marggraf.

97. At the hearing, the DOE offered into evidence only one document – a June 17, 2011

Cooke progress report that postdated the June 3, 2011 CSE meeting.

98. The DOE did not offer into evidence any of the documents relied on by the CSE in preparing S.B.'s 2011-2012 IEP.

99. Ms. Brock and Ms. Dutton bore the burden of proof on the second *Burlington* prong – the burden of demonstrating that Cooke was an appropriate placement for S.B. N.Y. Educ. L. § 4404(1)(c).

100. Ms. Dutton testified, as did her husband, Augustus Dutton, and four witnesses from Cooke: (1) Assistant Head of School Francis Tabone; (2) Sally Ord, who worked in student support services; (3) English Language Arts Teacher Beth Sullivan; (4) and Kevin Allard, Chairman of the Department of Mathematics and Science.

**The IHO Decision**

101. On May 21, 2012, IHO Kehoe issued his Findings of Fact and Decision on the merits of Ms. Brock's and Ms. Dutton's tuition claim for the 2011–2012 school year.

102. The IHO ruled in favor of Ms. Brock and Ms. Dutton on all three *Burlington* prongs and awarded them full tuition payment for S.B.'s attendance at Cooke.

103. With respect to the first *Burlington* prong, the IHO found that the DOE "did not meet its burden of proof that [it] offered a FAPE or that the proposed placement would be appropriate" for S.B. for the 2011–2012 school year.

104. The IHO found that without the "requisite evaluations" the DOE could not prove that it had offered S.B. an appropriate placement.

105. Furthermore, the IHO rejected the DOE's argument that its failure to conduct a triennial reevaluation of S.B., as required under 20 U.S.C. § 1414(a)(2)(B)(ii) and 8 N.Y.C.R.R. § 200.4(b)(4), was harmless because the CSE had access to S.B.'s progress report from Cooke.

106. The IHO found that S.B.'s progress report from Cooke was beneficial for illustrating S.B.'s progress while at Cooke but did not demonstrate how S.B.'s disability affected her progress in relation to a general education curriculum and was not adequate to support the DOE's 12:1:1 program recommendation.

107. IHO Kehoe specifically credited the testimony of the Cooke educators in finding that S.B. needed a smaller environment than the IEP's 12:1:1 program provided in order to benefit educationally.

108. With respect to the second *Burlington* prong, IHO Kehoe specifically credited the testimony and evidence from Ms. Dutton, Mr. Dutton, Dr. Shulman, and the Cooke educators to find that Plaintiffs proved that Cooke was an appropriate placement for S.B. for the 2011–2012 school year.

109. With respect to the third *Burlington* prong, the IHO found that Ms. Brock and Ms. Dutton demonstrated that equitable considerations favored an award of tuition payment.

110. The IHO ordered the DOE to issue direct payment to Cooke for the cost of S.B.'s 12-month 2011–2012 school year tuition in the amount of $55,775.00.

**The SRO Appeal**

111. By Verified Petition dated June 20, 2012, the DOE initiated an appeal of IHO Kehoe's decision to the SRO.

112. The DOE sought reversal of the IHO's decision on the following alleged grounds: (1) the DOE provided S.B. a FAPE for the 2011–2012 school year; (2) equitable considerations did not support an award of tuition payment; and (3) even if Ms. Brock and Ms. Dutton satisfied all three *Burlington* prongs, the DOE should not be compelled to pay S.B.'s tuition, because the contracts that Ms. Brock and Ms. Dutton signed with Cooke were "shams."

113. The DOE did not appeal from the IHO's determination on the second *Burlington* prong that Cooke was an appropriate placement for S.B. for the 2011–2012 school year.

114. Ms. Brock and Ms. Dutton, through counsel, responded to the DOE's Verified Petition in a Verified Answer and Cross-Appeal dated July 23, 2012. Ms. Brock and Ms. Dutton asserted defenses to each of the legal claims raised in the Verified Petition and requested dismissal of the DOE's appeal. Ms. Brock and Ms. Dutton cross-appealed from the IHO's decision with respect to the first *Burlington* prong to the extent that the IHO did not address their claims: (1) that S.B. would have been grouped with students at McSweeney who were functioning at much lower academic, social, and emotional levels than S.B., which would have prevented her from progressing; and (2) that McSweeney would not have met S.B.'s transition needs.

115. The DOE responded to Ms. Brock's and Ms. Dutton's cross-appeal in a Verified Answer to Cross-Appeal dated August 20, 2012. The DOE requested that the cross-appeal be dismissed and that its appeal be upheld.

**The SRO Decision**

116. In Decision Number 12-129, dated August 9, 2013, SRO Justyn P. Bates sustained the DOE's appeal and dismissed Ms. Brock's and Ms. Dutton's cross-appeal, overturning the IHO's decision on the first *Burlington* prong and finding that the DOE offered S.B. a FAPE for the 2011–2012 school year.

117. The SRO concluded that the DOE admittedly "failed to comply with the procedures related to conducting a reevaluation of the student at least every three years."

118. Despite finding that the DOE "improperly disregarded the proper procedures to reevaluate the student under the IDEA and state regulations," the SRO reversed the IHO's determination that this violation of federal and state law resulted in a denial of FAPE.

transition services were inadequate.

128. The SRO reversed the IHO's decision to the extent that it found that the DOE failed to offer S.B. a FAPE for the 2011–2012 school year and that the decision ordered the DOE to issue payment for S.B.'s 2011–2012 school year tuition at Cooke.

129. Last, and at variance with its determination that the DOE's failure to reevaluate S.B. did not result in a denial of a FAPE, the SRO ordered the DOE to reevaluate S.B. and, at a minimum, assess S.B.'s needs in the areas of cognitive, academic, speech-language, and adaptive functioning, as well as transition skills.

130. The SRO did not review the IHO's finding on the second *Burlington* prong, which the DOE had not appealed, and the SRO did not disturb the IHO's finding that Cooke was an appropriate placement for S.B.

131. The SRO did not review the IHO's finding on the third *Burlington* prong. The SRO did not determine whether equitable considerations supported Ms. Brock's and Ms. Dutton's tuition claim, or whether, if the three *Burlington* prongs were met, Ms. Brock and Ms. Dutton would qualify for a direct tuition payment award under *Mr. and Mrs. A.*

### FIRST CAUSE OF ACTION

132. The SRO erred in finding that the DOE's failure to perform a triennial evaluation as required under the IDEA and the New York State regulations did not result in a denial of FAPE for the 2011–2012 school year.

133. The DOE's failure to engage Ms. Brock and Ms. Dutton in the process of deciding whether or not to reevaluate S.B. violated the primary purposes of the IDEA to (1) "to ensure that all children with disabilities have available to them a free appropriate public education," and

(2) "to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(A)-(B).

134. The DOE violated the IDEA in failing to notify Ms. Brock and Ms. Dutton of its apparent decision not to reevaluate S.B. and in failing to notify Ms. Brock and Ms. Dutton of their right to request a reevaluation, thus significantly impeding Ms. Brock's and Ms. Dutton's opportunity to participate in the decision-making process regarding S.B.'s educational program.

135. The DOE failed to meet its burden of proving that its admitted failure to comply with the federal and state law triennial reevaluation requirements did not result in a denial of FAPE

136. Additionally, the IHO correctly determined that other evidence relied on by the CSE failed to make up for the absence of evaluative information demonstrating how S.B.'s disability affected her ability to make progress. The SRO erred in reversing this determination.

137. Despite the fact the DOE failed to satisfy is burden to present any of the evidence that the CSE meeting allegedly relied upon in crafting S.B.'s IEP, the SRO concluded that the CSE had adequate information to prepare an appropriate educational program for S.B.

138. In ordering the DOE to reevaluate S.B. and, at a minimum, assess S.B.'s needs in the areas of cognitive, academic, speech-language, and adaptive functioning, as well as transition skills, the SRO implicitly acknowledged that S.B. needed to be reevaluated before appropriate educational recommendations could be made.

139. The DOE's procedural violation of the IDEA's triennial reevaluation requirement resulted in a denial of FAPE to S.B., significantly impeded Ms. Brock's and Ms. Dutton's opportunity to participate in the decisionmaking process regarding the S.B.'s educational program, and caused S.B. a deprivation of educational benefits.

**SECOND CAUSE OF ACTION**

140. The SRO erred in reversing the IHO's finding that the DOE denied S.B. a FAPE for the 2011–2012 school year.

141. The IHO correctly determined that the DOE failed to demonstrate that the IEP's 12:1:1 program recommendation was appropriate for S.B. and, thus, the IHO correctly found that the DOE had denied S.B. a FAPE.

142. The IHO correctly assessed the credibility of the witnesses who testified before him to find that the IEP's recommended program did not provide enough small group instruction for S.B. to make academic progress. The SRO failed to accord appropriate deference to the IHO's credibility determination.

**THIRD CAUSE OF ACTION**

143. The SRO erred in finding speculative and irrelevant Ms. Brock's and Ms. Dutton's assertion that McSweeney, the DOE's recommended public school placement, was inappropriate for S.B., and the SRO erred in alternatively finding that McSweeney would appropriately implement S.B.'s IEP and address her needs.

144. The case law states that "A school district does not have 'carte blanche to assign a child to a school that cannot satisfy the IEP's requirements.'" *T.Y. v. New York City Dep't of Educ.*, 584 F.3D 412, 420 (2d Cir. 2009); *see also R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 192 (2d Cir. 2012) (confirming that the school site selected by the school district must "conform[] to the program offered in the IEP").

145. The SRO erred in finding that McSweeney could provide S.B. with appropriate academic instruction and transition services, and could appropriately group S.B. with students who had similar needs and whose academic performance was at similar level.

146. The SRO erred in determining that McSweeney's program would not have deviated from S.B.'s IEP in a "material or substantial way."

147. The SRO erred in finding that McSweeney was capable of providing S.B. with transition services consistent with her IEP mandate for the 2011–2012 school year.

### FOURTH CAUSE OF ACTION

148. The SRO erred in annulling the IHO's order awarding direct payment of S.B.'s 2011–2012 school year tuition at Cooke.

149. The IHO's tuition award was appropriate because all three *Burlington* prongs were satisfied:

    a.  the DOE failed to offer S.B. a FAPE for the 2011–2012 school year;

    b.  the IHO's finding on the second *Burlington* prong – that Cooke was an appropriate placement for S.B. for the 2011–2012 school year – is final and binding, as the DOE did not appeal that finding to the SRO;

    c.  the IHO's finding on the third *Burlington* prong – that the equities favored Ms. Brock's and Ms. Dutton's tuition claim – is correct and supported by the record.

150. The IHO's award of direct tuition payment was appropriate, and fully consistent with this Court's decision in *Mr. and Mrs. A.*

### FIFTH CAUSE OF ACTION

151. The SRO's decision was affected by errors of law, was not supported by the evidence of record, and was not thorough and careful. The SRO's decision should not be accorded deference by this Court, and should be reversed.

### RELIEF REQUESTED

WHEREFORE, Ms. Brock and Ms. Dutton respectfully request that the Court:

1. Assume jurisdiction over this action;

2. Conduct an independent review of the administrative record and any additional evidence;

3. Annul the decision of the SRO to the extent that it found that the DOE offered S.B. a FAPE for the 2011–2012 school year and annulled the IHO's award of direct tuition payment for S.B.'s attendance at Cooke;

4. Enter a judgment finding that:

    a. The DOE failed to offer S.B. a FAPE for the 2011–2012 school year;

    b. The IHO's finding that Cooke was an appropriate placement for S.B. for the 2011–2012 school year is final and binding; and

    c. Equitable considerations support an award of direct tuition funding for S.B.'s placement at Cooke;

5. Issue an order directing the DOE to make direct payment to Cooke for S.B.'s tuition for the 2011–2012 school year in the amount of $55,775.00;

6. Award Ms. Brock and Ms. Dutton reasonable attorney's fees and costs pursuant to 20 U.S.C. § 1415(i)(3)(B)(i)(I); and

7. Grant such other and further relief as the Court deems just and proper.


Dated: New York, New York
       December 6, 2013

THOMAS GRAY (TG 0880)
PARTNERSHIP FOR CHILDREN'S RIGHTS
Attorney for Plaintiff
271 Madison Avenue, 17th Floor
New York, NY 10016
(212) 683-7999 ext. 246
Fax: (212) 683-5544
tgray@pfcr.org

25